# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 6, 2018 Session

## TENNESSEE COMMUNITY ORGANIZATIONS, ET AL. v. TENNESSEE DEPARTMENT OF INTELLECTUAL AND DEVELOPMENTAL DISABILITIES

### Appeal from the Chancery Court for Davidson County
#### No. 16-0183-IV     Russell T. Perkins, Chancellor

_____

### No. M2017-00991-COA-R3-CV

_____

Appellants, home and community based service providers and their professional trade organization, appeal the trial court's grant of summary judgment in favor of Appellee Tennessee Department of Intellectual and Developmental Disabilities. The case, which was filed as a declaratory judgment action, involves financial sanctions levied against Appellant providers by Appellee for billing for day services in excess of the 243-day limit imposed by a federal waiver. Appellants assert, *inter alia*, that the imposition of these fines exceeded Appellee's statutory and/or contractual authority. Discerning no error, we affirm the trial court's grant of summary judgment against Appellants on all counts of their petition.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded

KENNY ARMSTRONG, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

William Beesley Hubbard and Robyn E. Smith, Nashville, Tennessee, for the appellants, Tennessee Community Organizations, Dawn of Hope, Inc., and Evergreen Life Services, Inc..

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Deputy Attorney General, for the appellee, Tennessee Department of Intellectual & Development Disabilities.

## OPINION

## I. Background

Section 1915(c) of the Social Security Act authorizes the Secretary of Health and Human Services to waive certain Medicaid requirements to allow states to provide home and community based services ("HCBS") to meet the needs of individuals receiving long-term care services in their homes or communities. 42 U.S.C. § 139n(c)(1); 42 C.F.R. § 430.25. The HCBS waiver describes a comprehensive program designed to meet the needs of the waiver population; the waiver includes requirements and limitations on services provided by state providers that contract with the state to provide the waiver services. At issue in this appeal is the 2014 HCBS waiver (the "Waiver"). The Waiver specifically provides that, "Day Services shall be limited to a maximum of 5 days per week up to a maximum of 243 days per person per calendar year."[1] The parties do not dispute that, under the plain language of the Waiver, providers may be paid for no more than 243 days of service per calendar year for each person served and may be reimbursed for no more than five days of services per week.

Tennessee Community Organizations ("TNCO") is a professional trade organization for HCBS providers. Dawn of Hope, Inc. ("Dawn") and Evergreen Life Services ("Evergreen," and together with Dawn and TNCO, "Appellants") are providers and members of TNCO. TennCare is the state agency responsible for Tennessee's Medicaid programs and for compliance with the HCBS Waiver. TennCare contracts with the Tennessee Department of Intellectual & Developmental Disabilities ("TDIDD," or "Appellee") to implement HCBS waiver services. To this end, TDIDD is authorized, by statute, to enter into contracts with providers to procure waiver services for eligible persons. Tenn. Code Ann. § 33-1-301(a). Both Dawn and Evergreen (together, "Providers") entered into contract with TDIDD under its standard provider agreement ("Agreement"). As discussed in further detail below, the Agreement requires, *inter alia*, that the Providers perform the waiver services in compliance with TDIDD's Provider Manual and the Waiver.[2]

As noted above, the Waiver at issue limits the number of days a provider may bill for day services. It is undisputed that, for several years, both Evergreen and Dawn violated the billing cap set by the Waiver. Prior to 2013, if a provider was in violation of the Waiver, TDIDD either stopped paying or recouped overpayment for services the providers billed in excess of the cap. However, in 2013, the Comptroller for the State of

---

[1] "Day Services" include community day, support employment, facility based day, and home based day. Day Services are required to last six hours to qualify for payment unless the termination of services before six hours is beyond the provider's control.

[2] The parties do not dispute that Providers were provided a copy of TDIDD's Provider Manual.

Tennessee issued a performance audit of TDIDD. The Comptroller noted that, despite its statutory authority to do so, TDIDD was not imposing sanctions for providers' violations of the Waiver. The concern was that if the State failed to take appropriate action to ensure compliance with the Waiver, it could risk termination of the Waiver and the associated federal funding.

Rather than levying sanctions immediately, TDIDD first decided to warn non-compliant providers so as to give them time to cure the billing issues. To this end, on July 14, 2014 and July 25, 2014, TDIDD sent warning letters to Dawn and Evergreen, respectively. The letters notified the Providers that each had billed in excess of the Waiver limits for 2012 and 2013. Although the letters set out the sanctions available under TDIDD Policy #80.4.6, discussed *infra*, neither provider was, in fact, sanctioned at this time. Rather, the letters stated that: "This letter serves as a sanction warning. Such a warning is not subject to appeal. Should future reviews find inappropriate billing of services, you may anticipate sanctions or other administrative action." Despite the warning letters, in 2014, both Evergreen and Dawn continued to bill for more than 243 days of day services for some service recipients. On October 12, 2015, TDIDD sent sanction letters to Evergreen and Dawn, notifying the Providers that they were being sanctioned for billing in excess of the 243-day waiver limit for 2014. Sanctions were assessed at $100.00 per day per recipient for each day billed over 243 days. Evergreen's sanctions totaled $2,200; Dawn's sanctions totaled $10,900. Evergreen did not appeal the sanctions; however, on October 23, 2015, Dawn requested an appeal hearing.

On February 22, 2016, TNCO filed a petition for declaratory judgment in the Chancery Court of Davidson County (the "trial court"), asking the trial court to declare TDIDD Policy #80.4.6 (the "Policy"), and any sanctions issued pursuant to the Policy, invalid.[3] In Counts I, II, and III of the petition, Appellants assert that TDIDD Policy #80.4.6 is invalid because it is inconsistent with TDIDD's statutory authority to issue "civil penalties." In Count IV of the petition, Appellants assert that Policy #80.4.6 is void because it is a Rule that was not properly promulgated pursuant to the Uniform Administrative Procedures Act ("UAPA") as required by Tennessee Code Annotated Section 33-1-309(a). In Count V of the petition, Appellants assert that the Policy's provision for sanctions for violation of the Agreement is not a proper sanction for breach of the Agreement. In Count VI, Appellants assert that the assessments against Evergreen and Dawn violate TDIDD's statutory authority. In Count VII, Appellants contend that, in imposing sanctions, TDIDD failed to comply with the review period and statutory period for appeal. In Count VIII, Appellants reiterate that the sanctions are invalid because

---

[3] One of TNCO's goals is to "institute administrative and judicial proceedings to protect and promote the provision of services to persons with disabilities and to protect and promote the rights of community provider organizations and their officers and employees." On March 23, 2016, TDIDD moved to dismiss TNCO's petition for declaratory judgment on the grounds of standing and justiciability. The trial court denied the motion and granted TNCO leave to amend its petition to add Evergreen and Dawn. TNCO filed an amended petition on June 14, 2016.

Policy #80.4.6, under which the sanctions were assessed, was an invalidly promulgated Rule, exceeded TDIDD's statutory authority to sanction, and imposed invalid sanctions for violation of the Agreement. In Count IX, Appellants assert that invoicing for more than 243 days of day services does not constitute a sanctionable offense.

On January 31, 2017, the parties filed cross-motions for summary judgment. The trial court heard the motions for summary judgment on April 7, 2017. In its order of April 26, 2017, the trial court denied Appellants' motion for summary judgment and granted TDIDD's motion as to all counts. Appellants appeal.

## II. Issues

The dispositive issue is whether the trial court erred in granting summary judgment in favor of TDIDD as to all counts of Appellants' petition. Appellants parse this question into seventeen issues as stated in their brief:

1. Whether TDIDD has statutory authority for its sanction policy and the sanctions.
2. Whether the sanction policy and the sanctions violate T.C.A. § 33-2-407, which authorizes TDIDD to monetarily sanction providers.
3. Whether the trial court erred by finding that T.C.A. 33-2-408 is a procedural statute but nevertheless authorizes TDIDD to monetarily sanction providers.
4. Whether the trial court erred by finding that T.C.A. § 33-2-408 authorizes TDIDD to monetarily sanction providers, in contravention of T.C.A. § 33-2-407 that specifies the process for TDIDD monetarily sanctioning providers.
5. Whether the trial court erred by finding that T.C.A. § 33-2-407 governs TDIDD assessing civil penalties upon providers, which T.C.A. § 33-2-408 independently governs TDIDD monetarily sanctioning providers.
6. Whether the provision in the Provider Agreement that authorizes TDIDD to monetarily sanction providers violates public policy and is invalid.
7. Whether the trial court erred by finding that TDIDD's authority to monetarily sanction providers is derived from contract.
8. Whether the trial court erred by finding that the sanctions were liquidated damages agreed to in the Provider Agreement.
9. Whether the Provider Manual gives TDIDD authority for its sanction policy and sanctions.
10. Whether the sanction policy is a rule and is void because it was not properly promulgated
11. Whether the trial court erred by finding that the sanction policy is of general applicability, but only concerns the internal management of

state government and does not affect private rights, privileges or procedure available to the public.

12. Whether TDIDD failed to give providers fair notice that it was no longer screening invoices and that it was changing its long-term interpretation of the requirements of the Waiver concerning the invoicing of over 243 days.

13. Whether TDIDD failed to give providers fair notice that future involving of over 243 days was prohibited and punishable.

14. Whether the trial court erred in finding that the warning letters to providers and conversations with providers constituted fair notice.

15. Whether TDIDD's termination of screening invoices and change in its long-term interpretation of the requirements of the Waiver concerning the 243-day limit was required to be promulgated as a rule.

16. Whether the trial court erred in finding that invoicing over 243 days has always been a sanctionable offense and TDIDD only began to strictly enforce the requirement, which does not require rulemaking.

17. Whether TDIDD's change in its long-term interpretation of the requirements of the Waiver concerning the 243-day limit is not enforceable because TDIDD failed to assess in writing the fiscal impact of the changes upon provider.

### III. Standard of Review

This case was decided on grant of summary judgment. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013); *Rye v. Women's Care Center of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Id*. (citing *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013); *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)). For actions initiated on or after July 1, 2011, the standard of review for summary judgment is governed by Tennessee Code Annotated Section 20-16-101. The statute provides:

In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:
(1) Submits affirmative evidence that negates an essential element of the

nonmoving party's claim; or

(2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

Tenn. Code Ann. § 20-16-101. Here, the material facts are not in dispute. Specifically, Appellants concede that Evergreen and Dawn's 2014 billings were in excess of the Waiver cap. However, the parties dispute the interpretation and applicability of the Policy, the statutory scheme, and the Agreement. The interpretation of written agreements and contracts are questions of law and, so, are particularly suited to disposition by summary judgment.

To the extent our review requires interpretation of statutes, we are guided by the familiar principles of statutory construction. The primary objective of statutory construction is to determine the intent of the legislature and give effect to that intent. *Walker v. Sunrise Pontiac–GMC Truck, Inc.*, 249 S.W.3d 301, 309 (Tenn. 2008). To achieve this objective, we begin by examining the plain language of the statute in question. *Curtis v. G.E. Capital Modular Space*, 155 S.W.3d 877, 881 (Tenn. 2005). This Court presumes that the legislature intended every word be given full effect. *Lanier v. Rains*, 229 S.W.3d 656, 661 (Tenn. 2007). Therefore, if the "language is not ambiguous ... the plain and ordinary meaning of the statute must be given effect." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808 (Tenn. 2007). It is a well-settled rule of construction that "statutes 'in pari materia'—those relating to the same subject or having a common purpose—are to be construed together, and the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute." *Graham v. Caples*, 325 S.W.3d 578, 581-82 (Tenn. 2010) (citing *Wilson v. Johnson Cnty*., 879 S.W.2d 807, 809 (Tenn. 1994)).

Likewise, to the extent that adjudication of this appeal involves the interpretation of the provisions of the Agreement, we apply the standard of review applicable to contract interpretation. Because the interpretation of a written agreement is a matter of law, *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006), we undertake to interpret the language of the Agreement de novo. "A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Id.* (citing *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005)). "In interpreting contractual language, courts look to the plain meaning of the words in the documents to ascertain the parties' intent." *Id.* (citing *Planters Gin Co. v. Fed. Compress & Warehouse Co*., 78 S.W.3d 885, 889-90 (Tenn. 2002)).

# IV. Analysis

Before addressing Appellants' specific arguments, it is helpful to discuss the interplay among the Waiver, the statutory scheme, TDIDD Policy #80.4.6, and the Agreement. In doing so, we apply the standards of review applicable to contract and statutory construction, which are set out *supra*.

The statutory scheme, Title 33, concerning "Mental Health and Substance Abuse and Intellectual and Developmental Disabilities," vests TDIDD with the "responsibility for system planning, setting policy and quality standards, system monitoring and evaluation, disseminating public information and advocacy for persons of all ages who have mental illness . . . or developmental disabilities." Tenn. Code Ann. § 33-1-201. To achieve its functions, TDIDD is authorized "to promote the use of private and public service providers . . . to achieve outcomes and accomplishments [to aid service recipients]." *Id.* In engaging these private and public service providers (such as Evergreen and Dawn), TDIDD is statutorily "empowered to enter into contractual agreements." Tenn. Code Ann. § 33-1-301(a); Tenn. Code Ann. § 33-1-302(a)(1) ("The department may: (1) Make . . . contracts . . . ."). Pursuant to its statutory authority to contract, TDIDD entered into Agreements with Evergreen and Dawn, discussed further *infra*.

In addition to its authority to contract, the statutory scheme also vests TDIDD with power to promulgate certain rules that providers will be required to follows. For example, Tennessee Code Annotated Section 33-2-406 requires that a waiver services provider "shall obtain a license from [TDIDD]. . . in order to lawfully establish . . . a service or facility . . . ." To this end, Tennessee Code Annotated Section 33-2-404 states that TDIDD "shall adopt rules for licensure of services." Reading these provisions, *in pari* materia, it is clear that in order to obtain a license for lawful operation, a service waiver provider must adhere to the specific "rules for licensure of services" adopted by TDIDD. Likewise, Tennessee Code Annotated Section 33-1-309(d) states that "[a]ll methodology utilized by [TDIDD] for determining payment to service providers shall be adopted as rules . . . ." Under Tennessee Code Annotated Section 33-2-407(b), which addresses suspension or revocation of licenses, TDIDD must "establish by rule a schedule designating the minimum and maximum civil penalties within the ranges set in § 33-2-409 that may be assessed under this part for violation of each statute and rule that is subject to violation." In addition to its authority to adopt licensure, payment, and civil penalty rules, TDIDD is also statutorily authorized to "[m]ake and enforce rules that are necessary for the efficient financial management and lawful operation of the facilities, programs or services . . . ." Tenn. Code Ann. § 33-1-302(a)(3). The statute does not specifically define what constitutes "rules . . . for . . . lawful operation." Nonetheless, Tennessee Code Annotated Section 33-1-309(a) requires that "the department shall adopt all rules in accordance with the Uniform Administrative Procedures Act [("UAPA")]." Tennessee Code Annotated Section 33-2-404(b) allows TDIDD to periodically "amend

its rules . . . to be consistent with the federal home-based and community-based settings final rule . . . ." From the foregoing statutes, we glean that TDIDD is statutorily authorized to promulgate rules concerning licensure, payments, civil penalties, and lawful operation of service providers' facilities. To be enforceable against a provider, these rules must be promulgated in accordance with the UAPA and must comport with federal requirements, including the Waiver.

In the event that a waiver service provider violates a statutory requirements under Title 33, e.g., attempts to operate without a license (Tenn. Code Ann. § 33-2-405), or violates a Rule promulgated by TDIDD pursuant to its statutory authority, the statutory scheme vests TDIDD with authority to impose civil penalties on the provider. Specifically, Tennessee Code Annotated Section 33-2-407 provides:

> (b) The department may impose a civil penalty on a licensee **for a violation of this title or a department rule**. Each day of a violation constitutes a separate violation. The department shall establish by rule a schedule designating the minimum and maximum civil penalties within the ranges set in § 33-2-409 that may be assessed under this part for violation of each statute and rule that is subject to violation. The department may exclude a statute or rule from the schedule if it determines that a civil penalty for violation of that statute or rule would not achieve the purposes of licensure. If the department has not adopted a rule designating the minimum and maximum civil penalty that may be assessed for violation of a statute or rule, the maximum civil penalty that may be imposed for violation of that statute or rule shall be the lowest figure set under the appropriate subsection of § 33-2-409 that applies to the violation.

Tenn. Code Ann. § 33-2-407(b) (emphasis added). From the emphasized language, TDIDD may only assess civil penalties if a provider violates a statutory requirement or a TDIDD rule. In the case of monetary civil penalties, Tennessee Code Annotated Section 33-2-409 limits the amount of the penalty, to-wit:

> (a) A civil penalty of not less than two hundred fifty dollars ($250) and not more than five hundred dollars ($500) may be imposed on a licensee for a violation of a statute or rule.
> (b) A civil penalty of not less than five hundred dollars ($500) and not more than five thousand dollars ($5,000) may be imposed on a licensee for a second or subsequent violation of the same kind committed within twelve (12) months of the first penalty being imposed.

In addition to its statutory authority to adopt rules for provider licensure, operation, payments, and to impose civil penalties for a provider's violation of these rules, TDIDD is also authorized to adopt "operating guidelines." Specifically, Tennessee Code Annotated Section 33-1-309(b) provides:

(b) All operating guidelines of the department of intellectual and developmental disabilities (sometimes referred to as "DIDD") and its successors shall be adopted pursuant to the procedure set forth in this subsection (b). For purposes of this section "operating guidelines" means instructions to service providers that the department deems or intends to be mandatory upon such providers. Interpretive instructions, other nonmandatory guidance from the department and rules adopted pursuant to the Uniform Administrative Procedures Act, are not operating guidelines.

(1) The adoption of operating guidelines shall be preceded by notice, public meeting, opportunity for comment and responses to such comments from the department; provided, however, in those instances in which the department determines that exigent circumstances require that the operating guideline be implemented prior to a public meeting, the department shall begin the process required by this section as soon as reasonably practicable after its implementation.

(2) The department shall provide notice in the Tennessee administrative register which shall include a general description of the subject of the operating guideline, the date, place and time of the public meeting and the opportunity for interested persons to provide oral or written comments. The date of the public meeting shall be no sooner than the first day of the month following the month of publication of the notice. The notice shall also include the name, address and telephone number of a contact person to provide additional information, including, if available, copies of the proposed operating guideline.

(3) A representative of DIDD shall be present to hear comments at a hearing required by this section. The representative shall be a person designated by the deputy commissioner of DIDD who is a director level or higher employee. This designee shall be authorized to conduct the meeting in such a manner as to provide reasonable opportunity for all interested persons to provide comments.

(4) Within thirty (30) days after the meeting, DIDD shall provide responses to the specific comments received and shall state the reasons for accepting or rejecting the comments. DIDD shall maintain an official record of the meeting, submitted comments and any responses.

Pursuant to its statutory authority under Tennessee Code Annotated Section 33-1-309(b), on or about January 23, 2013, TDIDD adopted Policy #80.4.6, with an effective date of March 15, 2013.  As stated in the Policy, its purpose "is to establish **guidelines** for applying **sanctions** against contracted entities due to **violations of** the provider agreement, provider manual, conditions of the home and **community based service waivers**, and departmental policies and procedures" (Emphases added).  Under the Policy, available sanctions for such violations are: (1) termination of the waiver service provider's contract; (2) moratorium on persons served; (3) management takeover by TDIDD; (4) mandatory training and assistance; and (5) financial penalties.

While Tennessee Code Annotated Sections 33-2-407 and 33-2-409 contemplate civil penalties for a provider's violation of Title 33, or TDIDD rules, Tennessee Code Annotated Section 33-2-408 authorizes TDIDD to impose "sanctions" when a provider engages in "deficient practices."  The statute provides, in relevant part:

(a) All proceedings by the department of intellectual and developmental disabilities (DIDD) to impose sanctions against licensed entities under this title shall be conducted in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. The proceedings shall include notice and opportunity for a hearing before an administrative law judge who shall issue an initial order.

(a) Sanctions shall include any action by DIDD, based upon alleged deficient practices of the licensed entity, to impose financial or contractual penalties, including the following:
   (1) Financial penalties shall include fines, liquidated damages, or denial or withholding or delay of a payment.

\*\*\*

(c) Sanctions do not include any action to recoup moneys that are determined by DIDD to be unearned, according to stipulations specified in the provider agreement between DIDD and the provider.

(d) This section shall not prevent termination of any contract with the licensed entity in accordance with the provisions of that contract. In those cases the contractor shall have only the due process rights, if any, otherwise provided by law regarding termination of state contracts.

(e) All sanctions, except for financial sanctions, may be imposed immediately by DIDD. This does not prevent the provider from appealing the decision using the process as provided in the Uniform Administrative

Procedures Act.

(f) These requirements shall not prevent the DIDD or the provider from pursuing alternative means of resolving issues related to sanctions while the process as provided in the Uniform Administrative Procedures Act is pending.

Tenn. Code Ann. § 33-2-408. The statute does not define what is meant by "deficient practices."

As discussed above, pursuant to its statutory authority to contract, TDIDD entered into Agreements with Evergreen and Dawn. In relevant part, the Agreement states:

> A.4. [TDIDD] Provider Manual. A copy of [TDIDD] Provider Manual shall be maintained by the State for review by the Provider. . . . The Provider agrees that any authorized and approved services that it provides to eligible persons served . . . shall be performed in accordance with this Agreement, [TDIDD] approved policies and the [TDIDD] Provider Manual as may be amended. . . .
>
> A.5. State and Federal Compliance. [TDIDD], TennCare, and the Provider shall be subject to all relevant and applicable state and federal . . . rules, regulations, and statutory requirements, including any amendments and/or revisions thereto, as they relate to this Agreement or any performance or approved service to eligible persons . . .
>
> (a) Waiver Services—Any Waiver Service as detailed in the [TIDD] Provider Manual and performed by the Provider shall comply with terms of the . . . [HCBS] waiver. . . .
>
> ***
>
> A.21 Sanctions and Licensure Action. For failure to comply with this Agreement or the standards and requirements referenced herein, [TDIDD] . . . may invoke sanctions and licensure actions pursuant to Tennessee Code Annotated, Section 33-2-408. . . .
>
> (a) Sanctions—The Sanctioning Agencies may impose sanctions including, but not limited to, the following . . .
>
> ***

- 11 -

(vi) assess monetary sanctions for any deficient practice.

\*\*\*

(c) In accordance with Tennessee Code Annotated Section 33-2-408, the following procedures and appeals process shall apply with regard to the imposition of any sanctions:

(i) [TDIDD] will provide notice of each sanction in writing. The Provider may appeal the sanction within ten (10) working days from the date of the written notice from the [TDIDD] Regional Director. The appeal must be submitted to the Deputy Commissioner of [TDIDD] through the Office of General Counsel by certified mail or by facsimile transmission. The notice of appeal must state the reason(s) for any objection to the sanction.

(ii) If notice of appeal is timely filed, the imposition of monetary sanctions will be stayed pending resolution of the appeal. A hearing will be scheduled in accordance with the Uniform Administrative Procedures Act requirements. . . .[4]

Under the plain language of the Agreement, the Providers agree to comply with the terms of the Waiver. In the event the provider violates the Waiver, the Agreement provides that TDIDD may levy monetary sanctions.

Because the trial court granted TDIDD's motion for summary judgment as to each count of Appellants' Petition, we will review each count of the petition to determine whether the trial court erred in granting summary judgment on that count. As an initial matter, TDIDD asserts, in its appellate brief that

[Appellants] ha[ve] raised 17 issues on appeal. [Appellants'] amended complaint consisted of only nine counts, and summary judgment was granted by the trial court in [TDIDD's] favor for each. To the extent that [Appellants] ha[ve] attempted to raise issues outside of its complaint, they should be deemed waived.

We agree. To the extent that Appellants' specific issues were not argued or adjudicated in the trial court, we will consider them to be waived on appeal. *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W. 3d 897, 905-906 (Tenn. 2004)

_____

[4] The Provider Agreement language is taken from the Provider Agreement entered by and between TDIDD and Dawn. It is undisputed that these contractual provisions are the same for both Dawn and Evergreen.

("Questions not raised in the trial court will not be entertained on appeal.") (citation omitted).

## Count I

In Count I of the Petition, Appellants contend that TDIDD

does not have authority for its Sanction Policy[, i.e., Policy #80.4.6,] and[,] therefore[,] the Sanctions issued pursuant to the Sanction Policy are invalid. The Sanction Policy conflicts with the statutory provisions. The statutes[, i.e., Tennessee Code Annotated Sections 33-2-407(b) and 33-2-409,] provide for the monetary sanction to be assessed against Providers for violations of Title 33 Tennessee Code Annotated and [TDIDD] Rules. The Sanctions issued were for practices that did not violate Title 33 or [TDIDD] Rules. . . .

In its order granting summary judgment in favor of TDIDD, the trial court restates Appellants' argument as follows: "Appellants argue[] that [the provider] invoicing violates neither Title 33 nor DIDD rules and thus the sanctions are in excess of the statutory authority provided in Tenn. Code Ann. § 33-2-407(b)." TDIDD counters that the monetary fines imposed on Evergreen and Dawn are not "civil penalties" governed by Tennessee Code Annotated Section 33-2-407(b), but rather sanctions governed by Tennessee Code Annotated Section 33-2-408, which "sanctions" are not subject to the limits set out in Tennessee Code Annotated Section 33-2-409, *supra*. The Policy specifically states that its purpose "is to establish **guidelines** for applying **sanctions** against contracted entities due to violations of the provider agreement, provider manual, conditions of the home and community based service waivers, and departmental policies and procedures" (Emphases added). The Policy cites, *inter alia*, the "Provider Agreement, TCA 33-2-408, [and] Tennessee Home and Community Based Waivers" as the "authority," under which the Policy is adopted. As discussed above, Tennessee Code Annotated Section 33-2-408 specifically authorizes TDIDD to impose sanctions for a provider's "deficient practices." Additionally, the Policy sets out those violations that may give rise to the imposition of sanctions, to-wit: TDIDD may impose "sanctions against contracted entities **due to violations of the provider agreement, provider manual, conditions of the home and community based service waivers, and departmental policies and procedures**" (emphasis added). Furthermore, Tennessee Code Annotated Section 33-1-309(b) authorizes TDIDD to adopt guidelines that will be mandatory on providers. The guidelines adopted in the Policy, including those regarding what will constitute a violation giving rise to sanctions, do not exceed TDIDD's statutory authority to adopt such guidelines. Moreover, although Tennessee Code Annotated Section 33-2-408 authorizes sanctions for a provider's deficient practices, the statute is silent as to what constitutes deficient practices. Accordingly, it is incumbent on TDIDD (pursuant to its statutory authority to adopt guidelines) to adopt criteria for imposition of

- 13 -

sanctions, i.e., to define what constitutes deficient practices. To this end, the Policy specifically enumerates those violations that may give rise to sanctions, i.e., "violations of the provider agreement. . . [and] conditions of the [HCBS] [W]aiver[]." Because sanctions are only allowed for deficient practices, and because the Policy sets out those circumstances that will give rise to sanctions, we conclude that the Policy's enumerated violations constitute deficient practices for purposes of imposing sanctions. Here, it is undisputed that the Providers' billing practices violated the Waiver and the Provider Agreement. From the plain language of the Policy, we conclude that a Providers' breach of the Provider Agreement and violation of the Waiver constitute "deficient practices," which are punishable by sanctions, including monetary fines. Because such violations are "deficient practices," under Tennessee Code Annotated Section 33-2-408, and not violations of rules or statutes, Tennessee Code Annotated Sections 33-2-407 and 33-2-409 are not implicated in this case.

In holding that TDIDD is entitled to summary judgment as to Appellants' first count, the trial court's order states, in relevant part, that

> Tenn. Code Ann. § 33-2-408(b) expressly acknowledges [TDIDD's] ability to sanction, including financial sanctions, for "deficient practices" of the licensed entity. As Tenn. Code Ann.§ 33-2-408 governs sanctions and as Tenn. Code Ann. § 33-2-408(b) provides for financial sanctions for "deficient practices" of the licensed entity, the Court finds that the Policy did not exceed [TDIDD's] statutory authority to impose sanctions. Accordingly, the Court finds that [TDIDD] is entitled to judgment as a matter of law on Count I of the Petition.

For the reasons discussed above, we agree with the trial court's holding. Tennessee Code Annotated Section 33-1-309(b) specifically authorizes TDIDD to adopt guidelines such as Policy #80.4.6. Tennessee Code Annotated Section 33-2-408 specifically authorizes TDIDD to impose financial sanctions for a provider's deficient practices. Although the statute does not define "deficient practices," this does not preclude TDIDD from defining this term under its power to promulgate guidelines. In this regard, Policy #80.4.6 does not exceed the scope of the authority granted under Section 33-2-408 insofar as the Policy defines "deficient practices" to include a provider's violation of the Provider Agreement and/or the Waiver.

## Count II

In Count II of the Petition, Appellants contend that the Policy exceeds the statutory maximum set out in Tennessee Code Annotated Section 33-2-409, *supra*. In holding that TDIDD is entitled to summary judgment as to Count II of Appellants' complaint, the trial court's order states, in relevant part, that:

In Count II, [Appellants] complain[] that the Policy's penalties exceed the statutory maximum as provided in Tenn. Code Ann. § 33-2-409 . . . . [TDIDD] argues that Tenn. Code Ann. § 33-2-409 governs civil penalties, not sanctions. [TDIDD] suggests that the correct statute is Tenn. Code Ann. § 33-2-408, which governs sanctions and which leaves the amount of financial sanctions for [TDIDD] to determine. The pertinent part of Tenn. Code Ann. § 33-2-408 provides: "(b) Sanctions shall include any actions by DIDD, based upon alleged deficient practices of the licensed entity, to impose financial or contractual penalties, including the following: (1) Financial penalties shall include fines, liquidated damages or denial, withholding or delay of a payment[.]" Tenn. Code Ann. § 33-2-408(b)(1). Thus, [TDIDD] argues, the range of financial sanctions provided by the Policy does not exceed the statutory authority provided. The Court agrees. Accordingly, the Court finds that [TDIDD] is entitled to judgment as a matter of law on Count II of the Petition.

As discussed above, by its plain language, Tennessee Code Annotated Section 33-2-409 governs "civil penalties," not sanctions. Here, the applicable statute is Tennessee Code Annotated Section 33-2-408(b). Although Tennessee Code Annotated Section 33-2-408 specifically states that "[s]anctions shall include any action by [TDIDD] . . . including . . .[f]inancial penalties . . .," it does not impose a limit on the amount of financial sanctions that TDIDD may impose for a provider's deficient practices. Just as TDIDD was statutorily authorized to set guidelines defining what constitutes a provider's deficient practices, the statute's silence as to the amount of sanctions allows TDIDD to promulgate guidelines concerning sanction amounts. To this end, and under the statutory authority granted in Tennessee Code Annotated Section 33-1-309(b), TDIDD's Policy sets out three classes of sanctions. Class A sanctions can result in a moratorium, termination of the provider agreement, or management takeover. Class B sanctions can result in daily sanctions of $100.00 to $500.00 until resolution of the deficient practice. Class C sanctions can result in a one-time sanction of $100.00 to $500.00. There is no allegation that the sanctions imposed against Evergreen and Dawn exceeded the amounts set out in the Policy. Appellants contend only that TDIDD exceeded the statutory maximum set out in Tennessee Code Annotated Section 33-2-409. This statute, however, governs civil penalties, not sanctions. As such, we conclude that the trial court did not err in granting summary judgment against Appellants as to Count II.

**Count III**

In Count III of the Petition, Appellants argue that the Policy's appeal procedure violates the statutory authority set out at Tennessee Code Annotated Section 33-2-407(c), which provides:

(c)(1) The **procedure governing the suspension or revocation of a license or imposition of a civil penalty** shall be as prescribed in this subsection (c).

*\*\*\**

(3) If the department determines that a license should be suspended or revoked, a civil penalty imposed, or both, it shall so notify the licensee. Within fifteen (15) days of notification, the licensee may file a written request for review by the panel appointed under § 33-2-403(d). The review shall be at the earliest possible date, and the panel shall report its recommendations to the commissioner. The commissioner shall determine whether the original action shall remain effective and shall notify the licensee. Within fifteen (15) days of notification, the licensee may file a written request for a hearing before the department. The hearing shall be conducted under the Uniform Administrative Procedures Act, compiled in title 4, chapter 5.

(Emphasis added). Relying on the foregoing statute, Appellants assert that the Policy omits the review panel and requires an appeal within ten days of notification rather than fifteen days as provided under the UAPA. Therefore, Appellants argue that the Policy violates TDIDD's statutory authority. As highlighted above, the procedure outlined in Tennessee Code Annotated Section 33-2-407(c) applies only when TDIDD seeks to suspend or revoke a provider's license or to impose civil penalties. As discussed above, in this case, TDIDD imposed sanctions against Evergreen and Dawn for deficient practices, as opposed to civil penalties for violation of Title 33 or TDIDD rules. Accordingly, Tennessee Code Annotated Section 33-2-407(c) (and specifically the 15-day time period set out therein) is not applicable. Instead, the correct statute is Tennessee Code Annotated Section 33-2-408, which provides that:

(a) **All proceedings by the department of intellectual and developmental disabilities (DIDD) to impose sanctions** against licensed entities under this title shall be conducted in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5. The proceedings shall include notice and opportunity for a hearing before an administrative law judge who shall issue an initial order.

(Emphasis added). In its order, the trial court found that "the correct statutory authority for sanctions is Tenn. Code Ann. § 33-2-408(a), which provides that the appeal process is governed by the UAPA and must include notice and an opportunity for a hearing before an administrative law judge who must issue an initial order." The only question, then, is whether TDIDD's Policy comports with Section 33-2-408(a). The Policy sets out the appeal process for sanctions as follows:

- 16 -

4. The following appeals process shall apply to sanctions.

   a. [TDIDD] shall issue a sanction letter to the provider prior to imposing any sanction.
   b. The provider may appeal the sanctions within ten (10) business days of receipt of the sanction letter, or from the date of the Department's decision regarding any additional information submitted as described above, whichever is later. The provider shall submit the appeal to the office of general counsel via certified mail or facsimile. The appeal shall state and explain the provider's objection(s) to the sanction.
   c. The office of general counsel shall review the appeal and route it to the Commissioner.
   d. If the provider filed the appeal within the specified time period, the imposition of monetary sanctions shall be stayed pending resolution of the appeal.
   e. The office of general counsel shall schedule a hearing in accordance with the Uniform Administrative Procedures Act.
   f. If the administrative law judge upholds the sanction, then, monetary sanctions shall be calculated from the effective date noted in the sanction letter.

In its order, the trial court further held that

The Policy's appeal process provides for a contested case hearing with notice and an opportunity to be heard. Accordingly, the Court finds that the Policy does not violate the statutory authority provided in Tenn. Code Ann. § 33-2-408(a). The Court finds that [TDIDD] is entitled to judgment as a matter of law on Count III.

We agree with the trial court's holding. Tennessee Code Annotated Section 33-2-408(a) merely requires that sanction proceedings be conducted in accordance with the UAPA, with notice and an opportunity for hearing. Unlike Tennessee Code Annotated Section 33-2-407(c) (which, for the reasons discussed above, is not applicable), Tennessee Code Annotated Section 33-2-408(a) does not impose a specific time frame. Accordingly, we cannot conclude that the 10-day time period set out in the Policy, *supra*, exceeds TDIDD's statutory authority. From the plain language of both the statute and the Policy, we conclude that the Policy meets the requirements of the statute insofar as the Policy provides for application of UAPA procedures, requires TDIDD to send notice of sanctions to the provider, and provides an opportunity for hearing before imposition of sanctions. Accordingly, TDIDD was entitled to summary judgment on Count III of the Petition.

**Count IV**

In Count IV of the Petition, Appellants argue that the Policy is void because it falls within the definition of a Rule and was not promulgated pursuant to the UAPA. As discussed above, the Policy clearly states that it is a "guideline," not a Rule. Despite this fact, Appellants contend that because the Policy establishes monetary sanctions, the Policy meets the UAPA's definition of a "Rule" and does not fall into one of the enumerated exceptions. The UAPA defines a "Rule," in relevant part, as follows:

> "Rule" means each agency statement of general applicability that implements or prescribes law or policy or describes the procedures or practice requirements of any agency. "Rule" includes the amendment or repeal of a prior rule, **but does not include:**
>
> (A)   **Statements concerning only the internal management of state government** and not affective private rights, privileges or procedures available to the public;
> (B)   Declaratory orders issued pursuant to § 4-5-223;
> (C)   Intra-agency memoranda;
> (D)   General policy statements that are substantially repetitious of existing law;

Tenn. Code Ann. § 4-5-102(12) (emphases added). In response to Appellants' argument, TDIDD asserts that its Policy was adopted pursuant to the statutory authority set out at Tennessee Code Annotated Section 33-1-309(b), *supra*. According to TDIDD, the Policy is simply an operating guideline, not a Rule because it falls within the exception for "statements concerning only the internal management of state government and not affecting private rights . . . ." Tenn. Code Ann. § 4-5-102(12)(A). Specifically, TDIDD contends that the sanction process affects only those providers that are under contract with TDIDD, not the public at large. TDIDD concedes that, if the Policy were broad enough to reach persons or entities that were not under contract to follow it, then the Policy would be a Rule subject to promulgation under the UAPA. However, because the Policy applies only to TDIDD employees and contracted entities, TDIDD contends that the Policy is an exception to the statutory definition of Rule and, thus, is not required to be promulgated pursuant to the UAPA. Nonetheless, Appellants contend that, in order to be defined as an operating guideline, the Policy would have to include instructions to providers that TDIDD intends to be mandatory. Appellants also assert that the Policy does not instruct the providers, but rather instructs the staff of TDIDD as to how the staff will sanction the providers. TDIDD, however, contends that the Policy clearly provides mandatory instructions for contracted providers regarding sanction guidelines and the appeals process. In support of this contention, TDIDD cites the Policy language: "This Policy applies to department staff responsible for enforcement of the provider agreement, provider manual, authorizing and applying sanctions, **and to all contracted entities**."

(Emphasis added).

In holding that the Policy was correctly adopted as an operating guideline pursuant to Tennessee Code Annotated Section 33-1-309(b), the trial court relied on Attorney General Opinion No. 07-42, to-wit:

> In Attorney General Opinion No 07-42, the Attorney General considered the Division of Mental Retardation Services ("DMRS") "operating guidelines" within its Provider Manual, which is a comprehensive manual to outline the basic principles and requirements for delivery of quality services to people with intellectual disabilities. After determining that DMRS is an "agency," as that term is defined under the UAPA, the Attorney General explained that DMRS retains statutory authority to promulgate rules as required by Title 33 pursuant to Tenn. Code Ann. § 33-1-309. Unless the "operating guidelines" fell within one of the statutory exceptions to the definition of a Rule under Tenn. Code Ann. § 4-5-102(12), the Attorney General stated that they would be required to be promulgated as rules under the UAPA.
>
> Citing to the exception to the definition of a Rule found at Tenn. Code Ann. § 4-5-102(12)(A), the Attorney General opined that DMRS' "operating guidelines" were to be imposed only on those providers under contract with DMRS, and, as such, the "operating guidelines" are statements concerning only the internal management of DMRS and do not affect private rights, privileges or procedures available to the public. Further, the Attorney General opined that the duty to comply with the provisions of the "operating guidelines" is a requirement of the contract with DMRS, and imposition of any penalty for failure to comply with the "operating guidelines" is only allowed as provided in the provider contract. *See* Tenn. Op. Atty. Gen. No. 07-42, 2007 WL 1451629 (April 4, 2007).

Applying the logic employed by the Attorney General, the trial court held that:

> The same can be said about the Policy here. The Policy is only to be imposed on those Providers under contract with [TDIDD] and, as such, are statements concerning only the internal management of [TDIDD]. The Policy does not affect private rights, privileges or procedures available to the public, and it contains instructions to service providers that the department deems or intends to be mandatory upon such providers. So, while the Policy is, indeed, an "agency statement of general applicability that . . . describes the procedures or practice requirements of any agency," it is also "[s]tatements concerning only the internal management of state government and not affecting private rights, privileges or procedures available to the public[]" and "instructions to service providers that the

- 19 -

department deems or intends to be mandatory upon such providers." Tenn. Code Ann. § 4-5-102(12); Tenn. Code Ann. § 33-1-309(b). Accordingly, the Court finds that the Policy fits within the exception to the definition of "Rule" as provided in Tenn. Code Ann. § 4-5-102(12)(A). Hence, the Policy was not required to be adopted in accordance with the UAPA as provided for in Tenn. Code Ann. § 33-1-309(a). For these reasons, the Court finds that [TDIDD] is entitled to judgment as a matter of law on Count IV.

We agree with the trial court that the Policy is an operating guideline, as opposed to a Rule. As noted above, the Policy specifically states that it applies to "department staff . . . **and to all contracted entities**." This language clearly narrows the Policy's application to TDIDD employees and to **contracted** entities such as Evergreen and Dawn. Although the substantive requirements outlined in the Policy primarily address the internal procedures that TDIDD will follow, the Policy also outlines the appeals procedure that contracted entities must follow in order to appeal the imposition of sanctions. In this regard, the Policy is mandatory only on TDIDD employees and contracted entities. It does not address or bear on "private rights, privileges or procedures available to the public[]." As such, we hold that the Policy meets the exception to the definition of a Rule under Tennessee Code Annotated Section 4-5-102(12)(A).

**Count V**

We now turn to Count V of the Petition, wherein Appellants argue that sanctions for breach of the Agreement are illegal. As set out in context above, the Agreement states that TDIDD "may invoke sanctions . . . pursuant to TCA § 33-2-408," and "sanctions includ[e], but [are] not limited to . . . assess[ment] [of] monetary **sanctions**" (emphasis added). Tennessee Code Annotated Section 33-2-408 defines "sanctions" as ". . . any action by [TDIDD]. . . to impose financial . . . **penalties**, including the following: (1) **Financial penalties** shall include fines, liquidated damages . . . " (emphases added). As discussed above, Tennessee Code Annotated Section 33-2-408 authorizes TDIDD to impose "financial penalties" for a provider's "deficient practices" but does not define what is meant by a deficient practice. In instances where the statute is silent, TDIDD has authority to adopt guidelines, *see* discussion above.[5] Here, TDIDD adopted Policy #80.4.6 as a guideline for assessing sanctions under its statutory authority to do so. As discussed above, the Policy enumerates those instances where sanctions are warranted, i.e., the Policy defines what constitutes a deficient practice, and specifically states that a "violation of the provider agreement" is a deficient practice that may give rise to sanctions.

---

[5] TDIDD's statutory authority to adopt guidelines is not limited to those instances where the statute is silent; however, TDIDD's guidelines may not exceed its statutory authority.

Appellants contend that sanctions meant to punish providers for breach of contract are disfavored in Tennessee. In its final order, the trial court explained the parties' respective positions as follows:

> In Count V, [Appellants] contend that the Policy provisions for violation of the Provider Agreement are invalid sanctions for breach of contract. [Appellants] allege[] that the provisions of the Provider Manual that permit sanctioning for deficient practices are illegal penalties that violate public policy. . . .

> [TDIDD] argues that, because the Provider Agreement does not describe sanctions as penalties, they should be considered liquidated damages. Further, [TDIDD] argues that, as in most governmental contracts, the damages for violations of the HCBS Waiver, Provider Manual, and Provider Agreements are uncertain or immeasurable. Tenn. Code Ann. § 33-2-408 acknowledges [TDIDD's] ability to impose financial and contractual penalties and the HCBS Waiver itself, which was approved by the federal government, contemplates sanctioning for failure to comply with its requirements. Thus [TDIDD] asserts that the sanctions here are properly construed as permissible damages.

In granting summary judgment in favor of TDIDD on this Count of Appellants' Petition, the trial court adopted TDIDD's argument that the sanctions imposed against Evergreen and Dawn are, in fact, liquidated damages, which the Legislature specifically authorizes TDIDD to collect insofar as the statutory definition of "sanctions," under Tennessee Code Annotated Section 33-2-408, includes "financial penalties," which include "liquidated damages," *see supra*. While we agree that, under the plain language of the statute, TDIDD may collect liquidated damages for a provider's deficient practices, including "violations of the provider agreement," we do not agree that the monetary amounts levied against Evergreen and Dawn constitute "liquidated damages" in this case.

The term "liquidated damages" is defined as a "sum stipulated and agreed upon by the parties at the time they enter their contract, to be paid **to compensate for injuries should a breach occur**." *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn.1980) (emphasis added); *see also **Kimbrough & Co. v. Schmitt,*** 939 S.W.2d 105, 108 (Tenn.App.1996), *perm. app. denied* (Tenn.1996). The stipulated amount represents an **estimate of potential damages** in the event of a contractual breach where damages are likely to be uncertain and not easily proven. *V.L. Nicholson*, 595 S.W.2d at 484 (emphasis added). Here, the sums assessed to Evergreen and Dawn were not levied to compensate TDIDD for injuries from Evergreen and Dawn's respective violations of the Provider Agreement and Waiver. This is so because there is no evidence that TDIDD's suffered any actual damages due to the Providers' billing violations. Rather, the monetary amounts charged to the Providers were meant to be coercive (i.e., to

force the Providers to comply with the Waiver), not compensatory (i.e., to compensate TDIDD for losses it suffered as a result of the Providers' breaches).

While we concede that, in defining what is meant by sanctions for deficient practices, the Provider Agreement uses the term "monetary sanctions" whereas the statute uses the term "financial penalties," this is merely a semantic conflict and a distinction without difference. Both are sanctions authorized under Tennessee Code Annotated Section 33-2-408. Furthermore, the amount of these sanctions was neither estimated nor unknown to the parties. Policy #80.4.6 clearly states that

> Class B. Sanction shall mean repeat violations or violations that involve multiple persons supported or an agency that supports only one (1) person. This deficiency may result in daily cumulative sanctions of $100.00 to $500.00 until resolution of the deficiency . . .

As discussed above, neither Tennessee Code Annotated Section 33-2-408, nor the Provider Agreement indicate the amount TDIDD may levy as a sanction for a provider's deficient practices. However, the Policy adopted by TDIDD pursuant to its statutory authority to establish guidelines clearly sets the amount of sanctions that may be imposed for the type of deficient practice at issue here. There is no evidence that TDIDD exceeded the Policy amount in sanctioning these Providers. Because TDIDD was authorized to impose financial sanctions for deficient practices in violation of the Agreement, we affirm the trial court's grant of summary judgment on this Count of the Petition

**Counts VI, VII, and VIII**.

In Count VI, Appellants assert that the sanctions violate statutory authority. In Count VII, Appellants contend that the appeals process for sanctions violates TDIDD's statutory authority. In Count VIII, Appellants argue that the sanctions are invalid because the Policy is a Rule, which was not promulgated according to the statute. These counts are largely reiterations of Counts I through V. Regardless, the arguments asserted in Counts VI through VIII are all premised on Appellants' contention that the sanctions are governed by Tennessee Code Annotated Sections 33-2-407(b) and 33-2-409. We have previously stated that these statutes apply only when TDIDD seeks to impose "civil penalties" against a provider. The instant case involves the imposition of sanctions, which are governed by Tennessee Code Annotated Section 33-2-408. For the reasons discussed above, TDIDD's imposition of these sanctions neither exceeded its statutory authority, nor violated any statutory requirements. Accordingly, TDIDD was entitled to summary judgment on these counts.

**Count IX**

In the last Count of the Petition, Appellants ostensibly make three arguments. First, Appellants contend that invoicing for more than 243 days of day services is not a sanctionable offense. Second, Appellants argue that TDIDD did not give the Providers proper notice before TDIDD began imposing monetary sanctions, in 2015, for invoicing more than 243 days in 2014. Finally, Appellants argue that, in view of the fact that, prior to 2014, TDIDD did not impose sanctions for overbilling, it was required to promulgate its new policy as a Rule or regulation, which it did not do. We will address each of these arguments in turn.

**a. Invoicing for More than 243 Days**

It is undisputed that the Waiver states that providers will not be reimbursed for service days in excess of the cap of 243 days of day services per individual per year. Appellants, however, argue that the Waiver does not limit the number of days of day services that a provider may **invoice**. The Provider Agreement states, in relevant part, that TDIDD

> will refuse payment to the Provider for services billed to [TDIDD] that are beyond the level of services authorized by [TDIDD] through Individual Support Plans or Individual Support Plan Amendments, exceed payment rates for these services are not billed to [TDIDD] within the appropriate time frame after the delivery of services.

Relying on the foregoing language, Appellants' argue that the Providers are not restricted from invoicing in excess of 243 days. Appellants further argue that the foregoing language places the burden on TDIDD to deny payment for invoicing that exceeds the 243-day cap. As support for this argument, Appellants note that, although the 243-day limit has been a Waiver requirement since 2007, until 2014, TDIDD handled over-invoicing by simply denying payment for the excess days. In other words, until 2014, TDIDD screened provider invoices for the number of days of day services and simply stopped paying once the 243-day limit was reached. TDIDD counters by pointing out that the Agreement expressly provides for sanctions, pursuant to Tennessee Code Annotated Section 33-2-408, for a provider's failure to comply with the requirements of the Provider Manual, etc. The Provider Manual also reiterates that failure to comply with the Agreement, specifically the provisions regarding the Waiver, are sanctionable offenses, i.e., deficient practices. Furthermore, the Agreement states that the provider must "comply with the terms of the Center for Medicare and Medicaid Services (CMS) approved 1915(c) Home and Community Based Services Waiver for Mentally Retarded and Developmentally Disabled." From the Agreement, Provider Manual, and Policy, it is clear that any violation of the Waiver is a sanctionable offense. The question remains,

however, whether the Waiver forbids a provider from **invoicing** more than 243 days for day services.

In relevant part, the Waiver provides that: "Day Services shall be limited to a maximum of 5 days per week up to a maximum of 243 days per person per calendar year." Again, Appellants argue that the Waiver does not specifically state that a provider may not invoice for more than 243 but only reiterates TDIDD's obligation to refuse payment for more than 243 days. In support of this argument, Appellants further note that providers are not able to determine when the 243 day limit has been reached for individuals because these individual may receive waiver services from multiple providers or they may move their services from one provider to another. Therefore, Appellants argue that providers have no way to ensure that their billings for individual service recipients do not exceed the 243 days.

In resolving the question of whether the Waiver forbids invoicing for more than 243 days of day services, the trial court's order explains:

> The terms of each state's waivers are unique, including services that may be covered and limitations applicable thereto. Tennessee has three waivers authorized under Section 1915(c) of the Social Security Act (the "Act") that permit the State to provide HCBS services that would otherwise not be available to individuals with intellectual disabilities and children with developmental disabilities. . . . Under the terms of each of Tennessee's approved Section 1915(c) waivers, day services are limited to a maximum of five days per week up to a maximum of 243 days per service recipient per year. The State Plan and any approved Waivers act as a contract between the State and Centers for Medicare and Medicaid Services ("CMS").
> States must comply with their Plan and approved Waivers and with all applicable federal law and regulations in order to receive federal matching funds for covered benefits provided to eligible enrollees, including federal waiver assurances set forth in 42 CFR § 441.302. One of these assurances pertains to the financial accountability of the program. These assurances are embedded into the Waiver application that the State submits to CMS and against which the State is monitored. In Appendix I: Financial Accountability of the CMS Waiver application template, section I-1: Financial Integrity and Accountability, the State is required to:

> > Describe the methods that are employed to ensure the integrity of payments that have been made for waiver services, including: (a) requirements concerning the independent audit of provider agencies; (b) the financial audit program that the state conducts to ensure the integrity of

provider billings for Medicaid payment of waiver services, including the methods, scope and frequency of audits; and (c) the agency (or agencies) responsible for conducting the financial audit program.

In each of the CMS-approved Waiver applications, the State offers three components of the financial audit program that the State conducts to ensure the integrity of provider billings for Medicaid payment of Waiver services. One of these components is "Fiscal Accountability Review" ("FAR"), whereby a review of the claims billed is compared to supporting documentation and all discrepancies are noted in a report that is submitted to the contract provider for comment. Another component is the State audit. The audit, which covers at least one fiscal year, includes a random sample of each program, including the HCBS Waiver program. Requests for documentation to support paid claims are made directly to selected providers. At the completion of the audit process, a comprehensive report is submitted to TennCare for review and follow-up to insure that findings are not repeated in subsequent years.

In a performance audit conducted in 2013 by the Office of the Comptroller, a finding was identified because [TDIDD's] computer system did not contain an edit that would prevent Providers who billed in excess of the 243-day limit from receiving Medicaid overpayments. It was further discovered that, with respect to the Self-Determination Waiver, TennCare's Medicaid Management Information System ("MMIS") did not have an edit in place to prevent these claims from being overpaid. Upon this discovery, TennCare took action to reconfigure MMIS to include an edit against the day services limits, which was put into place in 2013. In addition, working with [TDIDD], other overpayments that had been made under the Self-Determination Waiver in excess of the 243-day limit were recouped.

Providers are bound by the terms of their Medicaid Provider Agreement with TennCare and with [TDIDD] to comply with all relevant and applicable state and federal court orders, consent decrees, policies, rules, regulations, and statutory requirements, including any amendments and/or revisions thereto, as they relate to the Agreement or any performance of approved service to eligible persons supported. The Medicaid Provider Agreement affirms to Providers that they are not entitled to reimbursement for services beyond the scope of a defined Waiver service definition, including the 243-day limit on day services.

Applicable state and federal laws with which the State must comply include the federal and Tennessee False Claims Acts. Under the Guidance for Providers, developed by the US Department of Health and Human Services, Office of Inspector General, it is illegal to submit claims for payment to Medicare or Medicaid that the Provider knows or should know

are false or fraudulent. The Guidance describes the difference between unintentional mistakes and fraudulent or abusive behavior and makes it clear that submitting an erroneous claim for payment is different from submitting the same claim with actual knowledge, reckless disregard or deliberate ignorance of its falsity. The Guidance further describes non-covered services or items billed by a Provider as an example of fraud, waste and abuse. [TDIDD] argues that services in excess of a defined benefit limit (i.e., in excess of the 243-day limit) are non-covered services. Thus, [TDIDD] argues, in billing in excess of the defined 243-day limit specified in the CMS-approved Waiver application, Providers knowingly sought payment to which they were not entitled.

Under the terms of TennCare's Agreement with [TDIDD], [TDIDD] is required to take corrective actions as are necessary, including sanctions, when a Provider is unwilling or unable to comply with the Waiver program requirements. TennCare is obligated under the terms of the Waiver to limit the billing and payment for day services to 243 days per person per year. TennCare is also obligated under the Waiver to monitor Provider billing in order to provide assurance of financial accountability for the program, as well as to take appropriate action to ensure compliance. [TDIDD] argues that Providers are obligated to bill only for services they have been authorized to provide and in accordance with the covered services defined in the approved Waiver application. [TDIDD] further argues that Providers who submit claims for payment of day services in excess of the limit are in violation of the State's approved Waiver, as well as the federal and Tennessee False Claims Acts. The State is obligated to take appropriate action to assure compliance, and, if it does not, it risks termination of the Waivers and federal funding for HCBS services provided to vulnerable citizens under these programs.

[TDIDD] argues that the record reflects that billing in excess of the 243-day limit is a violation of the HCBS Waiver and Provider Manual. [TDIDD] further argues that violating the HCBS Waiver and Provider Manual is a deficient practice subject to sanction by agreement of the parties in the Provider Agreement. [TDIDD] argues that Providers have a responsibility to understand where a service recipient is with respect to benefit limit, so they know not to exceed the provision of service or the billing of service beyond a billing limit. Providers can talk to [TDIDD] about how may service units remain available. It is incumbent upon Providers to coordinate their care, and this applies to people who have more than one day services Provider.

Based on the foregoing discussion, the trial court ultimately held that the onus is on the Providers to ensure that they bill for only authorized services. Specifically, the trial court's order states that:

- 26 -

As to the question of whether invoicing/billing beyond the 243-day limit for day services is a deficient practice subject to sanctions, [Appellants'] answer is no. [Appellants] argue[] that, because Providers were previously allowed to bill for all services provided and [TDIDD] limited its payment to the 243-day limit, the onus was on [TDIDD] to only pay up to the 243-day limit. [TDIDD], on the other hand, answers the posed question as yes. [TDIDD's] argument is that invoicing/billing for over the 243-day limit has always been considered a deficient practice subject to sanctions and [TDIDD] places the onus on Providers to limit their billing/invoicing to only 243-days of day services.

Neither the Provider Agreement, Provider Manual, nor HCBS Waiver expressly states that Providers cannot bill/invoice in excess of the 243-day limit. Rather, the HCBS Waiver provides that day services shall be limited to a maximum of five days per week up to a maximum of 243 days per recipient per year. So, who has the onus to comply with this limit? The Court finds that, despite both parties having very compelling arguments, the most compelling argument is the one most consistent with the HCBS Waiver. That is: **Providers** are obligated to bill only for services they have been **authorized** to provide. Because Providers are only authorized to provide 243 days of day services, the onus is on Providers to only bill for 243 days of day services. As the Court has so found, it follows that the Court finds that invoicing/billing for over 243 days of day services is a deficient practice subject to sanctions. Accordingly, [TDIDD] is entitled to judgment as a matter of law . . . .

We agree that both TDIDD and the Providers have an obligation to ensure that the billings for waiver services are compliant with federal mandates. TDIDD does this by imposing requirements, contractual and procedural, on the providers. In turn, the providers do this by complying with these requirements. In this case, and for the reasons discussed above, the Providers breached the Agreement, Provider Manual, and the Waiver by submitting bills for services the Providers were not authorized to provide, i.e., day services in excess of the 243-day limit. As found in the Comptroller's audit, the Providers' deficient practices had the potential to negate the State's ability to receive federal funds for provision of waiver services, and TDIDD is statutorily authorized to impose sanctions as a means of enforcing proper practices by providers.

### b. Notice

Appellants contend that, without prior notice, TDIDD began levying monetary sanctions, in 2015, for invoicing more than 243 days in 2014. Although the sanction letters state that the Providers had been warned of the billing violations in 2014, Appellants contend that this is incorrect. Appellants argue that the sanction letters were

the first notice TDIDD sent regarding the overbilling. While maintaining that it sent warning letters before levying sanctions, TDIDD asserts that, regardless of the warning letters, the Providers were informed of the potential for sanctions as part of the terms of the Agreement. In holding that Appellants received adequate notice that TDIDD intended to start imposing sanctions in 2015, the trial court relied on the depositions of Lee Vestal, TDIDD Director of Risk Management and Licensure, and Robin Atwood, TNCO's Executive Director. The trial court's order states, in relevant part, that:

> Before sending the warning letters in 2014, Lee Vestal verbally spoke to every Executive Director of a Provider that was going to receive a warning letter. Thus, the Providers received verbal, as well as written, notice about stopping the practice of overbilling. Further, Robin Atwood, Executive Director of TNCO, set a letter to Lee Vestal . . . on September 9, 2014, which stated: "Going forward, providers are aware of the new expectations." TNCO represents its Providers. The Court finds that the testimony in the record establishes that [TDIDD] provided notice to TNCO, via warning letters to and Lee Vestal's conversations with Providers, that [TDIDD] expected Providers to not bill over the 243-day limit for day service.

The communication between Mr. Vestal and Ms. Atwood is not a disputed fact in the record. Ms. Atwood's September 9, 2014 letter clearly indicates that Providers, through their profession trade organization (TNCO), were on notice that TDIDD planned to impose sanctions going forward, even though it had not done so in the past.

Aside from Ms. Atwood's acknowledgement of TDIDD's "new expectation" for providers, the Agreement, which both Providers executed, clearly states that, for failure to comply with the Agreement or the standards and requirements referenced therein (*see* discussion above), TDIDD may invoke sanctions including monetary sanctions for deficient practices. In this regard, the Agreement provides adequate notice that providers may be charged with monetary sanctions for deficient practices such as billing in excess of the 243-day limit.

### c. Requirement to Promulgate Rules

Appellants argue that, when agencies change long-standing interpretations of statutes or regulations, they are required to promulgate rules. Specifically, Appellants allege that TDIDD's decision to change its long-standing interpretation of the requirements of the Waiver concerning the 243-day limit requires rulemaking because: the decision: (1) covers all providers operating under the Waiver; (2) applies to future invoicing; (3) prescribes a directive that was not otherwise clear; (4) constitutes a material and significant change from its previous position; and (5) is in the nature of an interpretation of law or general policy. In ***Tennessee Cable Television Association v.***

***Tennessee Public Service Commission***, 844 S.W.2d 151 (Tenn. Ct. App. 1992), this Court adopted the following test for when rulemaking is required, to-wit:

> if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy.

***Id.*** at 162-63 (adopting the test first enumerated in ***Metromedia, Inc. v. Director, Div. of Taxation***, 97 N.J. 313, 478 A.2d 742, 751 (1984)).

Appellants further assert that TDIDD failed to assess the fiscal impact of its change of interpretation on providers as required under Tennessee Code Annotated Section 33-5-108, which states, in relevant part, as follows:

> The department of intellectual and developmental disabilities shall assess in writing the fiscal impact on licensees under chapter 2, part 4 of this title, of any change to any rule, regulation, policy or guideline relating to the staffing, physical plant or operating procedures of the licensee for rendering services pursuant to a contract, grant or agreement with the department.

Specifically, Appellants allege that TDIDD did not determine the fiscal impact of restricting providers from invoicing all of their day services, which determination should have required application of the rulemaking process as it involved a change in TDIDD's interpretation of the Waiver requirements.

TDIDD asserts that there was no need to promulgate a Rule because there was no change in the interpretation of the Waiver—billing for over 243 days has always been a sanctionable offense as a violation of the Waiver, Provider Agreement, and Provider Manual. Therefore, the fact that TDIDD began to strictly enforce the Waiver does not mean that the terms of the Waiver changed. The 243-day limit for day services has been part of the Waiver since 2005, and the Providers agreed to comply with the limit by

- 29 -

executing the Agreement. Furthermore, TDIDD asserts that it did not have to determine the fiscal impact on providers because billing in excess of the cap has been a sanctionable offense since 2005, and Tennessee Code Annotated Section 33-5-108, on which Appellants rely, applies only to changes to rules, regulations, policies or guidelines.

In its order granting summary judgment in favor of TDIDD, the trial court made the following, relevant, findings:

> The Court agrees with [TDIDD] that because [TDIDD] began strict enforcement of the HCBS Waiver does not mean that the terms of the Waiver have changed. The HCBS Waiver, by its own terms, limits day services to 243 days. Strict enforcement of the Waiver does not require rulemaking or a new fiscal impact determination pursuant to Tenn. Code Ann. § 33-5-108. Furthermore, the Court finds that [TDIDD] provided notice to Providers, via warning letters to and Lee Vestal's conversations with Providers, that [TDIDD] expected Providers to not bill over the 243-day limit for day services and that billing over that limit would be considered a sanctionable offense. The testimony in the record reflects that the Providers who received sanction letters had previously received warning letters but continued to bill for day services over the 243-day limit.

We agree with the trial court's reasoning. TDIDD's decision to strictly enforce an existing requirement, after notice to the Providers, did not change the requirement. The 243-day billing limit was a requirement, to which the Providers agreed to be bound by executing the Agreement. Under the Agreement, TDIDD could have sanctioned for billing overages at any time after 2005. Having determined that billing/invoicing for over 243 days of day services was a deficient practice subject to sanctions, we conclude that TDIDD was entitled to summary judgment on Count IX of the Petition.

Any issue not specifically addressed herein is expressly pretermitted or deemed waived due to Appellants' failure to raise it in the trial court. *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr.*, 126 S.W. 3d at 905-906

## V. Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against Appellees, Tennessee Community Organizations, Dawn of Hope, Inc., Evergreen Life Services, and their surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE